### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF GEORGIA
### NEWNAN DIVISION

| | |
|---|---|
| IN RE: | |
| | CASE NO. 15-11593-WHD |
| SOUTHERN PAIN INSTITUTE, P.C. | |
| | CHAPTER 11 |
| Debtor. | |

## EXPEDITED MOTION TO APPROVE THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES PURSUANT TO 11 U.S.C. § 363

COMES NOW John A. Thomson, Jr. (the "Trustee"), the duly-appointed Chapter 11 Trustee for Southern Pain Institute, P.C., debtor in the above-captioned action (the "Debtor" or "SPI"), and hereby moves this Court, pursuant to 11 U.S.C. §§ 105(a) and 363, as well as Rules 2002, 6003, 6004, 9006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an Order authorizing the sale of a significant portion of SPI's assets to the entity that tenders an offer for the purchase of the identified assets that is the most beneficial to SPI's Estate.  In support of this Motion, the Trustee respectfully shows this Court as follows:

### I.    JURISDICTION AND VENUE

1.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

1415758

and 1334.

2.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3.

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.

The statutory bases for the relief requested herein are i) Sections 105 and 363 of Title 11 of the United States Code (the "Bankruptcy Code"); ii) Bankruptcy Rules 2002, 6003, 6004, 6006, 9006 and 9014; and iii) Rule 9013-4 of the Local Rules for the United States Bankruptcy Court for the Northern District of Georgia (the "Local Rules").

## II.  **BACKGROUND**

5.

On July 24, 2015 (the "Petition Date") the Debtor commenced this voluntary case (the "Case") by filing a petition for relief under Chapter 11 of the Bankruptcy Code.

6.

On February 24, 2016, the Office of the United States Trustee appointed the

Trustee as Chapter 11 Trustee for SPI in order to i) manage SPI's affairs; and ii) determine whether it was feasible and appropriate for SPI to reorganize.

7.

The Trustee continues in possession of SPI's properties, and continues to operate SPI's business pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

8.

In the three months since his appointment as Chapter 11 Trustee, the Trustee has continued to operate SPI, which is a clinic for the treatment of patients with recurring, serious pain. Dr. Anthony Clavo, a board-certified anesthesiologist and pain management physician, is the sole physician associated with SPI.

9.

During the interim period since his appointment, the Trustee and his retained consultants have carefully reviewed a number of aspects of SPI's business, including, but not limited to;

a)      The amount, character and collectability of SPI's accounts receivable;

b)      The character and amount of SPI's ongoing revenue from all sources;

c)      SPI's ordinary course monthly operating expenses;

d)      The character and demographic mix of SPI's patient base;

e)  Certain aspects of SPI's certification to treat Medicare patients;

f)  The status of the Debtor's surgical center (the "Surgicenter"), which operates in premises (the "Lagniappe Premises") that are directly contiguous to SPI's premises in Peachtree City, Georgia and leased by an affiliated company, Lagniappe, LLC ("Lagniappe").

10.

During April, 2016, the Trustee learned that Medicare had suspended any further payments to Dr. Clavo, and thus SPI, such that SPI cannot anticipate receiving any additional collections arising out of Medicare claims in the short to intermediate term.

11.

Medicare's decision to suspend further payments to SPI has seriously and materially contracted SPI's collections from all sources.

12.

As a result of this contraction in the Debtor's revenue, the Trustee has determined that SPI no longer has sufficient revenue to continue day-to-day operations for any extended period of time.  The Trustee has therefore concluded that SPI should either be i) sold to another entity pursuant to 11 U.S.C. § 363; or, in the absence of a viable purchaser, ii) shut down.  Accordingly, the Trustee has

instructed John Reidelbach, a consultant with Moore, Colson who has significant expertise in evaluating and brokering the sale of medical practices, to begin efforts to market SPI's assets to a purchasing entity.

### III.   THE PROPOSED SALE AGREEMENT

13.

Beginning on or about May 1, 2016 and continuing until June 3, 2016, the Trustee, operating through Reidelbach, has marketed SPI's assets to no less than three firms who are currently, actively engaged in some form of pain management services.

14.

On May 19, 2016, SPI executed that certain Letter of Intent with Concordia Anesthesiology, Inc. ("Concordia") that defined the general terms under which Concordia would purchase substantially all of SPI's assets from the Trustee. Subsequent to the execution of the Letter of Intent, Concordia and the Trustee began to actively negotiate over the terms of a satisfactory Asset Purchase Agreement.

15.

On June 6, 2016 the Trustee entered into an Asset Purchase Agreement (the "APA") with Concordia as purchaser.  A true and correct copy of the APA is

attached hereto as Exhibit "A".

16.

The APA provides that Concordia will purchase substantially all of SPI's assets necessary to continue the Debtor's ongoing business operations at its Peachtree City location (the "Sale").

17.

The APA contains the following general terms and conditions, *inter alia*:

a)  Concordia will buy the following assets of SPI:

  i.  SPI's furniture, fixtures and equipment (the "FF&E") associated with its Peachtree City location;

  ii.  SPI's leasehold rights to its leased premises at 1975 Highway 34, Suite 100, Peachtree City, Georgia (the "SPI Premises");

  iii.  SPI's tradenames, if any, and goodwill associated with same;

  iv.  Certain other assets as described in more detail in the APA (collectively, the "Acquired Property").

b)  The Acquired Property specifically excludes i) SPI's accounts receivable and pending medical claims of all sorts; ii) cash and cash equivalents; iii) narcotics; iv) patient records; v) the FF&E associated with SPI's Conyers location (the "Excluded Assets"), and the Trustee

will retain these assets in the Estate;

c)   Concordia will pay to the Trustee, for the benefit of the Estate, a purchase price of $300,000.00 cash (the "Purchase Price") at the time of closing of the Sale (the "Closing");

d)   Concordia will pay the Trustee $35,000.00 in earnest money upon the entry of an Order from this Court designating the APA as the Stalking Horse Bidder (the "Earnest Money"). The Trustee may use this Earnest Money to sustain the business operations of SPI, as and when needed, prior to Closing;

e)   The Trustee will credit the Earnest Money to the Purchase Price at Closing. If Concordia is not the successful bidder for the Assets at the conclusion of the Sale, Concordia will be entitled to receive a full refund of the Earnest Money from the proceeds of the Sale before any disbursements are made to any other creditors of the Estate.

f)   The Sale is contingent upon the Trustee obtaining authority to assign SPI's lease with Foot Pain, LLC (the "SPI Lease") for the SPI Premises. A Motion seeking authority to effectuate said assignment has been filed concurrently with this Motion;

g)   The Sale is further contingent on Lagniappe obtaining authority in its

1415758

own Chapter 11 proceeding, <u>In re Lagniappe, LLC</u>, United States Bankruptcy Court for the Northern District of Georgia, Case No. 16-10486 (the "Lagniappe Case") to assume and assign its lease with Foot Pain, LLC ("the Lagniappe Lease") for the Surgicenter. It is the Trustee's understanding that counsel for Lagniappe will file a motion to assume and assign the Lagniappe Lease substantially concurrent with the filing of this Motion;

h)      Closing will take place one business day after the Court enters Orders i) approving the sale of SPI's assets in accordance with the APA and this Motion (the "Sale Order"); ii) approving the assignment of the SPI Lease (the "SPI Lease Order"); and iii) approving the assumption and assignment of the Lagniappe Lease (the "Lagniappe Lease Order" and, collectively with the SPI Lease Order, the "Lease Orders");

i)      All of the Acquired Property will be sold in its place, as-is, where-is, with absolutely no warranties or representations whatsoever as to marketability, fitness for a particular purpose, functionality or other attributes.

18.

Lagniappe has consented to file a Motion to Substantively Consolidate the estates of Lagniappe and SPI.  This will facilitate the Sale Transaction, and recognizes the practical realities that:

a)   Lagniappe has few other creditors, whose claims are small;

b)   SPI regularly uses the Surgicenter, but has traditionally paid no fees to Lagniappe for the use of the Surgicenter;

c)   With only limited exceptions, SPI and Lagniappe have functioned as one business unit since the inception of Lagniappe.

19.

The Trustee anticipates that the Sale will yield a gross value to the Estate, after repayment of the Earnest Money, of $265,000.00.

20.

If the Trustee were to simply shut down SPI's operations, and maintain no employees to provide medical services:

a)   The Estate would realize negligible value from SPI's assets, as the furniture, fixtures and equipment have little market value if SPI's pain management practice is not a going concern:

b)   SPI's patients will have to be transferred to other providers in an

extraordinarily short period of time, and this may result in patients having to seek pain management services from a clinic that is further from their location.

21.

The Trustee anticipates disbursing the following amounts from the Sales Proceeds at or shortly after Closing:

a)  Credit for the earnest money;

b)  Broker commission of five percent (5%) due to Moore, Colson; (subject to Court approval);

c)  Payment of final salary due to SPI's employees;

d)  Payment of a cure on Lagniappe Lease; and

e)  Contingency for payment of certain claims that may be associated with SPI's FF&E.

22.

The Net Sale proceeds, plus i) cash on hand; ii) all collections from the remaining accounts receivable and medical claims; iii) any recoveries from the pursuit of avoidance actions; and iv) the liquidation of SPI's FF&E associated with its Conyers location, will be paid to fund creditors holding timely, allowed claims against the Estate in accordance with the priority system provided by the

Bankruptcy Code and any further Order of this Court with regard to compensation
of professionals.

### 23.

The origination of the APA and the consummation of the Sale would not
have been possible without the contributions of Moore, Colson's consultants.
Accordingly, the Trustee will move to amend the Court's earlier Order dated
March 7, 2016 [Doc. No. 83] approving the employment of Moore, Colson to
reflect and approve a payment of a commission to Moore, Colson equal to five
percent (5%) of the Sales Proceeds.  This five percent (5%) commission is usual,
customary and reasonable for professionals who assist in the purchase and sale of
medical practices, and is otherwise an ordinary course expense in similar sales
transactions.

### 24.

Based on the response that Moore, Colson has received from various
entities engaged in the provision of pain management services, the Trustee
believes that the value he will realize from the Sale constitutes fair market value
for the Acquired Property, and will maximize value to the Estate's various creditor
constituencies. Nevertheless, Concordia's bid under the APA will be subject to
higher or better offers.

25.

Accordingly, the Trustee is prepared to proceed with the Sale of the Acquired Property under the terms of the APA, subject to higher and better bids in accordance with the procedures proposed in the Trustee's "Expedited Motion For An Order Approving Procedures for the Sale of Substantially all of the Debtor's Assets Free and Clear of Liens, Claims and Encumbrances Pursuant to 11 U.S.C. 363" (the "Bid Procedures Motion"), which has been filed substantially concurrently herewith.

## IV.    THE URGENCY TO COMPLETE THE PROPOSED SALE

As noted above, the Debtor's cash flow and cash resources have dwindled dramatically since the suspension of the Medicare payments.  The Trustee has reached the point that he does not consistently have adequate cash to continue to operate the Debtor and pay ordinary course expenses in a timely manner.  If the Trustee cannot conclude a sale of the Acquired Property on a highly, highly expedited basis, the Trustee may have no alternative but to suspend the Debtor's operations.  This would result in a loss of the value of the Acquired Property as a going concern.

Substantially contemporaneously with the filing of this Motion the Trustee has filed his Emergency Motion for Expedited Hearing, wherein he has requested

that this Court:

1)      shorten the time period prescribed Fed. R. Bankr. Pro. 2002(a)(2) to significantly less than twenty-one days, as allowed by said rule and Fed. R. Bankr. Pro. 9006(c)(1);

2)      shorten the time period prescribed by Fed. R. Bankr. Pro. 6006 and 9014, as allowed by Fed. R. Bankr. Pro. 9006(c)(1), and set the hearings on the Motion to Assume the SPI Lease and the Motion to Assume the Lagniappe Lease concurrent with the hearing on the Sale Motion; and

3)      consider and rule upon his Bid Procedures Motion on an emergency basis, such that the Trustee can appropriately make potential upset bidders aware of the procedures and the date for the Auction and the Sale Hearing.

Unless the Trustee can obtain the relief prayed for in this Motion and the related Motions on assumption and assignment of the Leases, the Trustee fears that the value of SPI's assets as a going concern will be lost.

## V.    <u>NOTICE</u>

26.

Upon entry of an Order on the Bid Procedures Motion (the "Bid Procedures Order"), the Trustee will serve a copy of this Motion with exhibits, along with the Bid Procedures Order, the proposed Sale Order, and a "Notice of Sale" pursuant to Rule 6004(c)(1):

1) By electronic mail, overnight delivery service, or by next-day U.S. mail upon: i) Laginappe, LLC; ii) Foot Pain, LLC; iii) HTA Camp Creek III, LLC; iv) Delage Landen Financial Services, LLC; v) the United States Trustee; vi) Regions Bank, and (vii) counsel for the two other entities that could appear as upset bidders a the Sale; and

2)     First Class U.S. Mail on all other parties appearing on the Creditors Matrix in this case.

27.

The Trustee is prepared to submit a Notice of Sale providing notice of the hearing on this Motion pursuant to Rule 6004(f), which the Trustee proposes to serve on the parties listed above concurrent with service of the Bid Procedures Order.

28.

Fed. R. of Bankr. Pro. 2002(a) provides, in pertinent part, as

follows:

(a) Twenty-one-day notices to parties in interest

Except as provided in subdivisions (h), (i), (l), (p), and (q) of this rule,
the clerk, or some other person as the court may direct, shall give the
debtor, the trustee, all creditors and indenture trustees at least 21 days'
notice by mail of:

...

(2) a proposed use, sale, or lease of property of the estate other than
in the ordinary course of business, ***unless the court for cause shown
shortens the time or directs another method of giving notice***;

(Emphasis Added).

29.

Fed. R. of Bankr. Pro. 6004 provides, in pertinent part, as

follows:

(a) Notice of Proposed Use, Sale, or Lease of Property. Notice
of a proposed use, sale, or lease of property, other than cash
collateral, not in the ordinary course of business shall be
given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k) . . . .

1415758                                    15

30.

Fed. R. Bankr. Pro. 9006(c)(1) specifically envisions a situation where a

Court may see the need to reduce a prescribed time period:

(c) Reduction

(1) In general
Except as provided in paragraph (2) of this subdivision, **_when an act_**
**_is required or allowed to be done at or within a specified time by_**
**_these rules or by a notice given thereunder or by order of court, the_**
**_court for cause shown may in its discretion with or without motion_**
**_or notice order the period reduced_**.

(2) Reduction not permitted
The court may not reduce the time for taking action under Rules
2002(a)(7), 2003(a), 3002(c), 3014, 3015, 4001(b)(2), (c)(2), 4003(a),
4004(a), 4007(c), 4008(a), 8002, and 9033(b). In addition, the court
may not reduce the time under Rule 1007(c) to file the statement
required by Rule 1007(b)(7).

(Emphasis Added). None of the prohibited Rules apply to this Case.

31.

Fed. R. of Bankr. Pro. 9007 provides, in pertinent part, as

follows:

When notice is to be given under these rules, the court shall
designate, if not otherwise specified herein, the time within
which, the entities to whom, and the form and manner in which
the notice shall be given.

32.

The Trustee contends that the form of notice set forth above, and the period for scheduling the hearing on the Sale, comport with Bankruptcy Rules 2002(a)(2), 6004, 9006, 9007 and 9014, constitute good and sufficient notice of the relief sought herein, and of all hearings and procedures contemplated hereby.

## VI.    RELIEF REQUESTED

### A.    Authorization of the Sale in Accordance With the APA

The Trustee is requesting, pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9006, 9007 and 9014, the entry of an order (the "Sale Order") on an expedited basis authorizing the Sale in accordance with the terms of the APA and an auction to be scheduled under the Bid Procedures Order.

### B.    Good Faith Purchaser Designation

The Trustee asks the Court to designate Concordia as a good faith purchaser, as such term is utilized in Section 363(m) of the Bankruptcy Code. Such designation can be made by a Bankruptcy Court in the context of a sale of assets of an estate when it has been established that the proposed purchaser is an unrelated third party, not affiliated with or having any insider relationship with the debtor, and when the proposed transaction is for fair value and is the result of

arm's length negotiations between the parties. *See* <u>In re Abbotts Dairies of</u>
<u>Pennsylvania, Inc.,</u> 788 F.2d 143 (3d Cir. 1986).

### C.     Higher And Better Offers

As discussed above, the Trustee has agreed to sell the Acquired Property to
the Concordia, subject to higher and better offers and approval by the Court as
requested herein. If any other offers are received by the Trustee that comply with
the Court's Order on the Bid Procedures Motion, the Trustee shall identify the
highest and best offer and ask the Court to approve such offer.

### D.     Waiver of 14-Day Stay on Closing

Bankruptcy Rule 6004(h) provides that an order authorizing the use, sale, or
lease of property will be stayed for fourteen days after entry of such approval
order unless the court orders otherwise. Because of the urgent need to close the
Sale contemplated by this Motion before SPI runs out of cash resources,  the
Trustee requests that the Court order and direct that the requirements of Rule
6004(g) be waived, such that the Sale Order shall not be automatically stayed for
fourteen days.

### E. Waiver of Any  Related Transfer Taxes

The Trustee moves that any taxes related to the conveyance of the Acquired
Property, or any other assets to be sold pursuant to the Bid Procedures Order, be

exempt from any imposed transfer taxes pursuant to Section 1146 of the Bankruptcy Code.

## VII.  LEGAL ARGUMENT

### A.    Best Interests Of The Estate

The Trustee believes that the sale of the Acquired Property to Concordia, or such other and higher bid as the Trustee may receive under the Bid Procedures Order, will provide a significantly greater realization for the Acquired Property than shutting down SPI's operations and liquidating the Acquired Property.  This is particularly true when one considers all of the attendant additional costs of liquidation, including storage of the Acquired Property, accruing interest and taxes, auctioneer's fees and advertising costs.

Section 363(b) of the Bankruptcy Code provides that a trustee ". . . after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."   Under the prevailing case law, a sale under Section 363(b) requires that the Court "expressly find from the evidence presented . . . a good business reason" to approve the sale.  Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983). _Accord_ Stephens Industries, Inc. v. McClung, 789 F.2d 386, 389-90 (6th Cir. 1986); In re Titusville CountryClub, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991).

The Trustee believes, and therefore avers, that the present circumstances of this bankruptcy case warrant approval of the sale of the Acquired Property under the standard articulated in <u>Lionel</u>.    Thus, a sale of the Acquired Property is appropriate, and meets the requirements of Section 363(b), as the proposed Sale represents the exercise of sound business judgment on the part of the Trustee.

Section 363(f) of the Bankruptcy Code provides, in pertinent part, as follows:

(f)  The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if --

(2) such entity consents;

* * *

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(2), (4) and (5).    The Trustee believes that approval of the proposed Sale of the Acquired Property to Concordia (or any other successful purchaser) comports with Section 363(f)(2) of the Bankruptcy Code, in that to the extent that any creditor asserting a valid interest in and against the Acquired

Property does not consent to the sale, or whose claim is subject to bona fide dispute, they may be compelled to accept a money satisfaction of such interest in accordance with Section 363(f)(5) of the Bankruptcy Code.

In addition, Section 105(a) of the Bankruptcy Code authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The purpose of Section 105(a) is to insure a Bankruptcy Court's power to take whatever action "is appropriate or necessary in aid of the exercise of its jurisdiction." 2 Collier on Bankruptcy, 105.01, at 105-2 (15th ed. 1993). Thus, this Court may exercise its equitable powers to grant the relief requested in this Motion.

Finally, approval of the Sale contemplated by the APA and this Motion will help facilitate the Trustee's ability to file and seek approval of a liquidating plan of reorganization and distribute the Net Sale Proceeds, as well as the recoveries from the liquidation of SPI's other assets and causes of action, in accordance with the priorities delineated in the Bankruptcy Code. Because the Trustee i) has been in place for more than three months; ii) is intimately familiar with the Debtor's accounts receivable and the methods for collecting same, and has already assembled a team that is engaged in this process; and iii) understands the requirements for shutting down a medical practice such as SPI, allowing the

Trustee to file a liquidating plan and complete the winding down of SPI's business, including securing its medical records, and liquidate its remaining assets and causes of action is the most cost efficient way to complete the administration of SPI.

## VIII. <u>NO PRIOR REQUEST</u>

No prior request for the relief requested herein has been made to this Court or any other court in connection with this Case.

WHEREFORE, the Trustee respectfully requests (A) entry of a Sale Order, as shall be tendered to the Court and served under separate notice, and (B) such other and further relief as the Court deems just and proper.

Respectfully submitted this 6th day of June, 2016.

/s/ John A. Thomson, Jr.
JOHN A. THOMSON, JR.

Georgia Bar No. 706760
*Chapter 11 Trustee*

COHEN, POLLOCK, MERLIN & SMALL, P.C.
3350 Riverwood Parkway
Suite 1600
Atlanta, Georgia, 30339
(770 858-1288
jthomson@cpmas.com

1415758                                    22

# EXHIBIT A

## AGREEMENT FOR PURCHASE AND SALE OF ASSETS

**THIS AGREEMENT FOR PURCHASE AND SALE OF ASSETS** (the "**Agreement**") is made and entered into as of the 3rd day of June, 2016, between **JOHN A. THOMSON, JR. (the "Trustee"), as the duly appointed Chapter 11 Trustee for Southern Pain Institute, P.C., debtor in the pending bankruptcy case entitled IN RE SOUTHERN PAIN INSTITUTE, P.C., United States Bankruptcy Court For The Northern District Of Georgia, Case No. 15-11593 ("Seller"),** and **CONCORDIA ANESTHESIOLOGY, INC.,** a Georgia corporation, or its designee ("**Buyer**", and sometimes hereinafter with Seller referred to collectively as the "**Parties**").

## W I T N E S S E T H:

**WHEREAS,** Southern Pain Institute, P.C. ("**SPI**") operates interventional pain management clinics at (i) 1975 West Hwy 54, Suite 100, Peachtree City, Georgia 30214 (the "**Peachtree City Location**") and (ii) 1309 Wellbrook Circle NE, Conyers, Georgia 30012 (the "**Conyers Location**", and, sometimes collectively with the Conyers Location, the "**Locations**"); and

**WHEREAS,** SPI is the debtor in a Chapter 11 proceeding currently pending in the United States Bankruptcy Court for the Northern District of Georgia, Newnan Division, Case No. 15-11593 (the "SPI Case");

**WHEREAS,** SPI operates the Peachtree City Location through the use of an ambulatory surgery center located at 1975 West Hwy 54, Suite 105, Peachtree City, Georgia 30214 (the "**Surgicenter**") that is operated by Lagniappe, LLC **("Lagniappe"**);

**WHEREAS,** Lagniappe is the debtor in a Chapter 11 proceeding currently pending in the United States Bankruptcy Court for the Northern District of Georgia, Newnan Division, Case No. 16-    (the "Lagniappe Case");

**WHEREAS,** upon the terms and conditions contained herein, Buyer wishes to purchase certain tangible and intangible assets of SPI, as set forth on **Exhibit A** (collectively, the "**Acquired Property**"); and

**WHEREAS,** Buyer wishes to accept an assignment of the lease for the Surgicenter, as assumed by Lagniappe in the Lagniappe Case;

**WHEREAS,** Seller is the duly appointed Chapter 11 Trustee for SPI by virtue of that certain "Order Granting Motion for Approval of Appointment of Trustee John A. Thomson, Jr." entered by the Honorable Homer W. Drake, Judge of the United States Bankruptcy Court for the Northern District of Georgia (the "**Court**") on February 24, 2016 [DN 72], and desires to sell and transfer the Acquired Property to Buyer, upon the terms and conditions contained herein;

**NOW, THEREFORE,** for and in consideration of the premises, mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and

sufficiency of which are hereby acknowledged, the Parties hereto represent, warrant and agree as follows:

1.   **PURCHASE AND SALE OF ASSETS.**

   1.1   **Acquired Property.**  Subject to the terms and conditions contained herein, Seller shall sell, transfer, convey and assign to Buyer, and Buyer shall purchase and acquire from Seller, on the Closing Date (as herein defined), all right, title and interest in and to the Acquired Property, free and clear of all liens, claims, encumbrances and security interests, except as specifically provided herein.  The Acquired Property shall include the following:

   (a) All tangible property of SPI, including, but not limited to, all inventory, furniture, fixtures, instruments, tools, supplies, computer software and equipment of SPI (the "FF&E") located in the Peachtree City Location, as well as any FF&E used to operate the Surgicenter ( the "Tangible Property");

   (b) SPI's interest under that certain Net Office Lease Agreement dated April 15, 2011 between Foot Pain, LLC, as landlord, and SPI, as tenant, as amended by that certain First Lease Amendment dated May 1, 2013 between Foot Pain, LLC, as landlord, and SPI, as tenant (the **"SPI Lease"**);

   (c) To the extent permitted by applicable law and regulations, any records of any patient of SPI, unless any patient specifically indicates, in writing, his or her election not to transfer their patient records to Buyer;

   (d) Such limited warranties or other rights and causes of action relating to the Acquired Property as Seller, acting as Trustee, can present to the Buyer; and

   (e) The name "Southern Pain Institute, P.C.," any other trade names or service marks that have been appropriately protected, and any goodwill associated with same.

   1.2   **Excluded Assets.**  The following assets of Seller shall be retained by Seller, are not Acquired Property and are not being sold or assigned to Buyer hereunder:

   (a) all cash and cash equivalents possessed at the Closing Date;

   (b) all claims, rights to payment, medical entitlements, accounts receivable, trade receivables, notes receivable, and other receivables of SPI of any form or character;

   (c) all taxpayer and other identification numbers, and minute books, stock transfer books and other documents relating to the organization, maintenance, and existence of Southern Pain Institute, P.C. as a corporation;

   (d) any and all contracts, agreements, licenses, approvals, schedules or other assets or qualifications necessary for Seller to continue to collect any and all of the Accounts Receivable from any source, the intent of the Parties being that nothing contained in

this Agreement, or the transaction contemplated hereby, shall interfere with the Trustee's ability to collect SPI's receivables; and

(e) Any narcotics, drugs or other controlled substances currently held in inventory by SPI;

(f) Any Medicare/Medicaid provider numbers;

(g) Any retirement funds maintained by SPI, if any;

(h) Any tools or medical devices specifically owned by Anthony T. Clavo.

(i) All tangible property of SPI located in the Conyers Location, including, but not limited to, all inventory, furniture, fixtures and equipment of SPI (the "FF&E") located in the Conyers Location, and fee simple title to building at 1309 Wellbrook Circle NE, Conyers, Georgia 30012, Building H (the **"Conyers Building")**  that houses the Conyers Location**.**

## 2.    PURCHASE PRICE; LIMITED ASSUMPTION OF LIABILITIES.

**2.1    Purchase Price.**    In consideration of the sale, assignment, transfer and conveyance of the Acquired Property, and Seller's efforts to secure approval for, and consummation of, the assumption and assignment of the Lagniappe Lease, and in reliance upon the limited and prescribed covenants, representations and warranties made herein by Seller, and subject to the conditions set forth in Section 3.3, at the Closing, Buyer shall pay to Seller the sum of Three Hundred Thousand and 00/100 Dollars ($300,000.00) (the **"Purchase Price")**, which shall be paid by wire transfer.

**2.2    Auction Process.**    Buyer, after consulting with competent counsel skilled in proceedings pursuant to the 11 U.S.C. 101 et seq. (the **"Bankruptcy Code")**, acknowledges and agrees that Seller will use this Agreement as a 'stalking horse' agreement in connection with a motion, made pursuant to 11 U.S.C. 363, to sell the Acquired Assets (the **"Sale Motion")**. Pursuant to the Bankruptcy Code and a procedures Order that Seller will seek to obtain from the Court (the **"Procedures Order")**, this Agreement, and the offer set forth therein, will be subject to exposure to the market, and is specifically subject to higher and better offers at a duly noticed hearing before the Court (the **"Auction")**.

**2.3    Earnest Money.**    Concurrent to the approval of this Agreement as the stalking horse bid by the Court, Buyer shall convey to Seller the sum of $35,000 in immediately available funds as earnest money for the purchase of the Acquired Assets (the "Earnest Money").    Seller covenants that the Earnest Money shall be used primarily to cover operating expenses for the Peachtree City Location; and that no more than $1,000 of the Earnest Money shall be used to cover ordinary operating expenses of the Estate for the Locations and otherwise, except that no Earnest Money shall be used for payment of the mortgage on the Conyers Location.    Said Earnest Money will be returned to Buyer as a credit against the Purchase Price at Closing. Should Buyer not successfully acquire the Acquired Assets, Buyer will have a super-priority

administrative claim to return of the $35,000 Earnest Money directly from the proceeds of the sale of the Acquired Assets to another purchaser.   The intent of the Parties is that the Earnest Money shall not be at risk unless and until Buyer breaches the terms of this Agreement to such an extent that Seller is entitled to retain the Earnest Money.

**2.4    Limited Assumption of Obligations.**   At the Closing, Buyer shall assume all of obligations of SPI with regard to the SPI Lease, and all obligations of Lagniappe with regard to the Lagniappe Lease that arise from and after the Closing Date with respect to the Lease Agreements.

**2.5    Other Obligations Not Assumed.**   Except as expressly provided in Section 2.4 and in this Section 2.5, Buyer shall not assume any obligation or liability of Seller of any kind, and Seller shall pay, satisfy and perform all of its obligations, whether fixed, contingent, known or unknown and whether existing as of the Closing or arising thereafter in accordance with the provisions of the Bankruptcy Code.  Under no circumstances shall Buyer be deemed to assume any liability or obligation of Seller arising out of or relating to any of the following:  (a) any actual or alleged tortious conduct of Seller or any of its employees or agents; (b) any claim against Seller for breach of any contract; (c) any claim predicated on fraud or strict liability or any similar legal theories; (d) the violation of any law, ordinance or regulation in effect prior to the Closing; (e) any asset that is not part of the  Acquired Property; (f) any lien, claim or encumbrance on any Acquired Property; (g) any liability for expenses or taxes, if any, in connection with, resulting from or arising out of the negotiation, authorization, preparation, execution and performance of this Agreement or the transactions contemplated hereby; (h) any liability of Seller for any federal, state or local taxes of any kind or character; (i) any liability of Seller under or arising by reason of this Agreement; (j) any liability of Seller to related Parties; (k) any liability of Seller relating to services performed for or goods received by Seller on or before the Closing; or (l) obligations arising under any of the Lease Agreements on or prior to Closing.  Because Seller is conveying all of the Acquired Property free and clear of liens claims and encumbrances pursuant to the Bankruptcy Code, the obligations of Seller pursuant to this Section shall not survive the Closing of the transactions contemplated by this Agreement.

**2.4    Allocation of Purchase Price.**   Buyer and Seller agree that the Purchase Price shall be allocated among the Acquired Property on the basis of an allocation (the "**Allocation**") as set forth on **Schedule 2.4**.  The Parties shall make all tax reports, returns and claims and other statements consistent with the Allocation and shall not make any inconsistent written statement on any returns or during the course of any Internal Revenue Service or other tax audit, except as may be adjusted by subsequent agreement following a tax audit or court decision.

**3.    CLOSING.**

**3.1    Closing**.  The consummation of the transactions contemplated in this Agreement (the "**Closing**") shall take place within one (1) business day after the entry of all of the last of the following Orders by the Court, i) the Order approving the Sale Motion; ii) the Order approving the assumption and assignment of the SPI Lease; iii) the Order authorizing the assumption and assignment of the Lagniappe Lease (the "**Closing Date**").  Closing shall take place at the Seller's

law offices, or at such other place and time as the Parties may mutually agree to, to be effective at 11:59 p.m. as of the Closing Date.


**3.2** **Transactions and Documents at Closing**.

(a) **Buyer's Deliveries**. At the Closing, Buyer shall deliver to Seller (i) the Purchase Price as provided above, subject to credit for the earnest money; (ii) an assignment and assumption agreement with respect to both of the Lease Agreements in form reasonably satisfactory to Buyer and Seller; and (iii) a closing statement in form reasonably satisfactory to Buyer and Seller.

(b) **Seller's Deliveries**. At the Closing, Seller shall deliver to Buyer (i) the Acquired Property, (ii) a Bill of Sale with respect to the Acquired Property, in substantially the form attached hereto as **Exhibit B**, (iii) an assignment and assumption agreement with respect to the SPI Lease in form reasonably satisfactory to Buyer and Seller, after obtaining an order from the Court approving the assumption and assignment of each of the SPI Lease; iv) quiet possession to the Peachtree City Location; and (v) a closing statement in form reasonably satisfactory to Buyer and Seller. Seller shall also use his best efforts to cause Lagniappe to deliver i) an assignment and assumption agreement with respect to the Lagniappe Lease in a form reasonably satisfactory to Buyer and Seller, after obtaining an order from the Court approving the assumption and assignment of the Lagniappe Lease; and ii) quiet possession to the Surgicenter.

(c) **Further Assurances**. For so long as the SPI Case remains open and the Trustee remains as Trustee for SPI, each Party shall, at the request of any other Party from time to time and at any time, whether on or after the Closing, and without further consideration, execute and deliver such assignments, transfers, assumptions, conveyances, receipts, acknowledgments, acceptances and assurances as may be reasonably necessary to procure for the Party so requesting, and its successors and assigns, or for aiding and assisting in collecting and reducing to possession, any and all of the Acquired Property, or to otherwise satisfy and perform the obligations of the Parties hereunder.

**3.3** **Exclusive Posession.** Seller shall deliver exclusive possession of the Peachtree City Location to Buyer at Closing. Seller shall use his best efforts to cause Lagniappe to deliver exclusive possession of the Surgicenter to Buyer at Closing.

**3.4** **Conditions on Buyer's Obligation to Close**. As conditions of Buyer's obligation to consummate the transactions herein described: (i) to the extent required by the Bankruptcy Code, Seller shall deliver to Buyer at the Closing an assignment and assumption agreement executed the landlord/lessor under the SPI Lease consenting to the assignment of SPI's interest in the SPI Lease to Buyer, (ii) the Court shall have issued an order approving the Sale Motion under the terms and conditions of this Agreement; iii) the Court shall have issued an Order approving Seller's assumption of the SPI Lease and assignment of the SPI Lease to Concordia (or designee), (iv) Lagniappe shall deliver to Buyer at the Closing an assignment and

assumption agreement executed by the landlord/lessor under the Lagniappe Lease consenting to the assignment of Lagniappe's interest in the Lagniappe Lease to Buyer, v) the Court shall have issued an Order approving  Lagniappe's assumption of the Lagniappe Lease and assignment of the Lagniappe Lease to Concordia (or designee),and vi) any limited representations and warranties that  Seller may be authorized to give under the Bankruptcy Code shall be true and correct as of the Closing Date.

4.    **ADDITIONAL AGREEMENTS.**

  **4.1** **Expenses.** All expenses incurred by Buyer in connection with the negotiations among the Parties, and the authorization, preparation, execution and performance of this Agreement and the transactions contemplated hereby shall be paid by Buyer. All expenses incurred by Seller in connection with the negotiations among the Parties, and the authorization, preparation, execution and performance of this Agreement and the consummation of the transactions contemplated hereby shall be paid by Seller.

  **4.2** **Brokers.** Moore, Colson & Company has been approved as financial advisor to the Seller, and is authorized to assist the Seller in selling the Acquired Property.    As such, Moore, Colson shall be entitled to collect a fee for said work in accordance with the Bankruptcy Code, the Local Rules of the Court and the prior Orders in the SPI Case.   No other brokers have been approved as professionals to render services to the Seller in conjunction with this transaction, and therefore no broker or agent shall have any claim against the assets or Buyer.

  **4.3** **Utilities; Telephone Service.** The Parties shall use their best efforts to transfer all utility services, including telephone service, to Buyer at Closing or as soon thereafter as is practicable.  If not transferred at Closing, any utility charges or expenses shall be appropriately pro-rated between Seller and Buyer as of the Closing Date.

  **4.4** **Employees.** Immediately prior to the Closing, Seller shall terminate all of SPI's employees.  Seller shall be responsible for payment of all amounts, including without limitation wages, accrued vacation and sick leave time, FICA, and FUTA taxes, due and owing to or with respect to any employee, which accrue prior to the Closing Date, all in accordance with the provisions of the Bankruptcy Code.

  **4.5** **Tax Clearance Letter.** Seller is conveying the Acquired Assets of SPI to Buyer pursuant to 11 U.S.C. 363 and the other provisions of the Bankruptcy Code, free and clear of all liens, claims and encumbrances, particularly including, but not limited to, tax liabilities.  As such, no tax clearance letter is necessary, and Seller will not provide same.

  **4.6** **Medical Records of SPI.**   It is the intention of the Parties that the current patients of SPI at the Peachtree City Location will transition their ongoing care to Buyer.  To the extent that any patient of SPI authorizes Seller to transfer his or her records to Buyer, Seller will do so as soon as practicable after receiving such a request.  Seller will have certain duties with regard to the preservation of the medical records of SPI patients who do not elect to transfer their records to Concordia after the Closing.    Accordingly, for sixty (60) days after closing Buyer shall allow Seller to use the unoccupied portions of the Peachtree City Location to store these

medical records and collate and prepare them for storage in accordance with applicable federal regulations.

### 4.7   HIPAA Compliance.

(a)   Each of the Parties has complied, and is in compliance, with the applicable provisions of the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act provisions of the American Recovery and Reinvestment Act of 2009, and as otherwise may be amended from time to time, and any and all implementing regulations, as in effect from time to time, including, but not limited to the Privacy Standards (45 CFR Parts 160 and 164), the Electronic Transaction Standards (45 CFR Parts 160 and 162) and the Security Standards (45 CFR Parts 160, 162 and 164), promulgated under the Administrative Simplifications subtitle of the Health Insurance Portability and Accountability Act of 1996 (collectively, **"HIPAA"**).

(b)   Seller and Buyer agree to work together to ensure all medical records are securely transferred from Seller to Buyer in accordance with HIPAA, and all related rules, regulations and guidance, including, but not limited to, the Privacy Rule, the Security Rule, the Breach Notification Rule and the HIPAA Omnibus Rule.  Seller and Buyer will work together to ensure all patients are notified, in writing, at each patient's most current address on file with Seller that their records are being transferred from Seller to Buyer as a result of the transactions contemplated by this Agreement (**"Patient Notice"**).  The Patient Notice must inform the patients that they may request, in writing, within a reasonable time-frame, that their records (or copies of their records) be sent to a provider or entity of their choice, other than Buyer, and instructions for doing so, including who to contact for the request and any imposed time-frame for submitting the request.  Until all records have been transferred from Seller to Buyer, Seller and Buyer agree to cooperate to ensure all patient requests for medical records are met within thirty (30) days, or a one (1) time request for a thirty (30) day extension has been made to the patient with a written explanation to the patient of the reason for the delay and the expected date of completion, in accordance with the HIPAA Omnibus Rule.  Either Seller or Buyer, whichever party completes the medical record request, must ensure any fees charged to the patient for the cost of locating, duplicating and mailing the patient's medical records are reasonable and in accordance with all applicable state law requirements and restrictions on medical record production fees.  Buyer will pay for all fees and expenses necessary to prepare said Patient Notices and send same to the Patients.

### 5.   REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER.

To induce Buyer to enter into and perform this Agreement, Seller represents and warrants to Buyer as follows:

### 5.1   Authority and Qualification of Seller.   Subject to Bankruptcy Court approval, Seller has the full power and authority to execute, deliver and perform this Agreement, and this Agreement has been duly and validly authorized, executed and delivered by Seller and

constitutes the valid and legally binding obligation of Seller enforceable in accordance with its terms.

  **5.2** <u>**Title to Acquired Property**</u>. At the time of their conveyance to Buyer, Seller shall have obtained authority from the Court to convey all of the Acquired Property, free and clear of all claims, liens, encumbrances and security interests except as specifically provided herein, to Buyer.

  **5.3** <u>**As-Is, Where-Is, No Warranties**</u>. Seller will convey the Acquired Property to Buyer as-is, where-is in SPI's offices. Buyer acknowledges that it has had fair and adequate opportunity to inspect the Acquired Property and the Peachtree City Location, and Seller therefore makes no warranty whatsoever as to the condition, functionality, merchantability, fitness for a particular purpose or status of the Acquired Property or the office location.

  **5.4** <u>**Condition of Acquired Property**</u>. As of the Closing Date:

    (a) On the Closing Date, the Acquired Property shall be in a condition at least as good as the condition that such items are in as of the date hereof.

    (b) On the Closing Date, each of the Lease Agreements shall be in full force and effect, and Seller and Lagniappe shall have performed any obligations as ordered by the Bankruptcy Court under 11 U.S.C. 365. Any rent or other amounts due or which have been paid under any of the Lease Agreements shall be pro-rated as of Closing.  Seller and Lagniappe, respectively, shall deliver to Buyer at Closing assumption and assignment agreements, to the extent required by the Bankruptcy Code, duly executed by the applicable landlords, with respect to each of the Lease Agreements.

  **5.5** <u>**Due Diligence.**</u> Seller acknowledges that it and its agents have been given ample opportunity to conduct due diligence of the assets of SPI, its financial circumstances, leased premises, owned premises, its medical practice and all other information necessary for Buyer to make an informed decision as to the condition of SPI and the suitability of Buyer's acquisition of SPI and the Acquired Property.  No further due diligence shall be available to Buyer prior to Closing.

  **5.6** <u>**Taxes.**</u> All relevant taxing authorities will be properly served with notice of the Bankruptcy Case and the Sale Motion, as required by the Bankruptcy Code and Bankruptcy Rules.

  **5.7** <u>**Litigation.**</u> Other than the contents of the various Proofs of Claim that have been filed in the Case, which Buyer acknowledges it can access and review through PACER, Seller makes no representations or warranties of any kind with regard to any litigation or lawsuits that may be pending against SPI.

  **5.9** <u>**Conduct of Business.**</u> From the date hereof, through the Closing Date, Seller shall use his best efforts to manage, operate and maintain SPI's business at the Locations in the ordinary course.  There will be no material adverse change, through and including the Closing

Date, in the condition, financial or otherwise, of Seller, except changes occurring in the ordinary course of business, which changes shall not have a materially adverse effect on the business, or property, of Seller.  Seller shall maintain and continue all existing policies of insurance with respect to SPI's business and the Acquired Property from the date hereof through the Closing Date.

6.    **REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER.**

As an inducement to Seller to enter into and perform this Agreement, Buyer hereby represents, warrants and agrees that upon obtaining approval of the various orders by the Court, Buyer shall have full power and authority to execute, deliver and perform this Agreement, and this Agreement will be duly and validly executed and delivered by Buyer and constitute the valid and legally binding obligations of Buyer enforceable, in accordance with its terms, except as the same may be limited by the Bankruptcy Code or similar laws affecting the rights of creditors generally, and subject to general equity principles.

7.    **Intentionally omitted.**

8.    **MISCELLANEOUS.**

8.1    **Entire Agreement**.    This Agreement supersedes all prior discussions, understandings and agreements between the Parties with respect to the matters contained herein and this Agreement contains the sole and entire agreement between the Parties with respect to the transactions contemplated herein.

8.2    **Notices**.    All notices, requests, demands, tenders and other communications required or permitted under this Agreement shall be in writing and shall be duly given if sent by electronic mail and overnight courier service to each other Party at that Party's address as set forth below:

(a)    If to Buyer:

Dye Snyder, LLP
260 Peachtree Street, Suite 502
Atlanta, Georgia 30303
(o) 678.705.7795
Attn:  Clinton Dye, III
tdye@dyesnyder.com

WITH A COPY TO

C. Reeves, MD

*CFO*
*Concordia Anesthesiology, Inc.*
3475 Lenox RD, NE
Suite 655
Atlanta, GA 30326
office:  404.478.8785
creeves@caimd.com

   (b)    If to Seller:

John A. Thomson, Jr.
Cohen, Pollock, Merlin and Small
3350 Riverwood Parkway
Suite 1600
Atlanta, Georgia 30339
jthomson@cpmas.com
(770) 857-4797

WITH A COPY TO

Benjamin S. Klehr
Cohen, Pollock, Merlin and Small
3350 Riverwood Parkway
Suite 1600
Atlanta, Georgia 30339
bklehr@cpmas.com

Either Party may change its mailing address by giving notice to the other Party in the manner provided above.

     **8.3**    **Waiver**.  Any term or condition of this Agreement may be waived at any time by the Party hereto which is entitled to the benefit thereof, but that waiver will be effective only if evidenced by a written document signed by such Party.  No course of dealing or performance by any Party, and no failure, omission, delay or forbearance by any Party, in whole or in part, in exercising any right, power, benefit or remedy, shall constitute a waiver of such right, power, benefit or remedy.

     **8.4**    **Execution in Counterparts**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument.

     **8.5**    **Severability**.  If any provision of this Agreement or any instrument or other document delivered pursuant hereto or in connection with this Agreement is for any reason held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other instrument or document, and this

Agreement and such other instruments and documents shall be interpreted and construed as if such invalid, illegal or unenforceable provision had not been contained in this Agreement.

**8.6    Time of Performance**.  Time is of the essence of this Agreement.

**8.7    Governing Laws**.  This Agreement shall be deemed to have been made and entered into in the State of Georgia, and all rights and obligations of the Parties hereto shall be governed by and construed in accordance with i) the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of the Court and any applicable bankruptcy case authority; and ii) to the extent otherwise applicable, the laws of the State of Georgia, without regard to its choice-of-law provisions.

## 9.    BREACH.

9.1    Breach by Buyer.  Upon a breach of this Agreement by Buyer, Seller shall deliver written notice of said breach to Buyer at the address listed above.   If said breach remains uncured three (3) business days after receipt of said notice by Buyer at the address prescribed above, Seller shall be entitled to declare this Agreement to be null, void and of no further effect. This right will include the right to close a sale transaction with any second or back-up bidder at the auction without further notice to Buyer.  If a breach remains uncured, Seller shall be entitled to retain, as liquidated damages and not as a penalty, the Earnest Money, without further notice to Buyer, and without Buyer having any rights to assert a claim against Seller in the SPI Case.

9.2    Breach by Seller.  Upon a breach of this Agreement by Seller, Buyer shall deliver written notice of said breach to Seller at the address listed above.   If said breach remains uncured three (3) business days after receipt of said notice by Seller at the address prescribed above, Buyer shall be entitled to declare this Agreement to be null, void and of no further effect. Buyer shall be entitled to the return of all of its earnest money paid to Seller under this Agreement. Other than the return of its earnest money, Seller will not have, and shall not be entitled to, any claim whatsoever against SPI, Seller or the Estate arising out of any such breach.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed as of the day and year first above written.

**SELLER:**

**JOHN A. THOMSON, JR., As The Duly Appointed Chapter 11 Trustee For Southern Pain Institute, P.C., Debtor In The Pending Bankruptcy Case Entitled In Re Southern Pain Institute, P.C., United States Bankruptcy Court For The Northern District Of Georgia**

By: _____
JOHN A. THOMSON, JR.

(signatures continued from previous page)

**BUYER:**

**CONCORDIA ANESTHESIOLOGY, INC.,** a
Georgia corporation

By: _____
Christopher Reeves, M.D.
Chief Financial Officer

## EXHIBIT A

## ACQUIRED ASSETS

The assets to be transferred from Seller to Buyer include the following, excluding the items set forth on Exhibit B to the Agreement:

1.  all personal property, including without limitation all furniture, fixtures, equipment, machinery, tools and supplies, specifically the property listed on Attachment 1 to this exhibit, and including personal property which has been fully depreciated, save and except any personal instruments and other medical devices owned by Anthony T. Clavo, M.D.;

2.  all leasehold interests and leasehold improvements created by leases of real property under which SPI is a tenant;

3.  all leasehold interests and leasehold improvements created by leases of personal property under which SPI is a lessee;

4.  all inventory at the Peachtree City Location;

5.  all trade names and applications therefor;

6.  all rights in connection with prepaid expenses with respect to the assets being transferred hereunder;

7.  all computer software at the Peachtree City Location; and

8.  all goodwill associated with the items described above.

**Exhibit B**

[Bill of Sale to be inserted]

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION**

IN RE:

SOUTHERN PAIN INSTITUTE, P.C.

      Debtor.

CASE NO. 15-11593-WHD

CHAPTER 11

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I will cause caused service of the within and foregoing **EXPEDITED MOTION TO APPROVE THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES PURSUANT TO 11 U.S.C. § 363** to be made upon all parties in the above-referenced action in accordance with the procedures set out in the Court's Order on the Trustee's Emergency Motion for Expedited Hearings filed contemporaneously herewith.

This 6th day of June, 2016.

                    /s/ John A. Thomson, Jr.
                    JOHN A. THOMSON, JR.

                    Georgia Bar No. 706760
                    *Chapter 11 Trustee*

1415758